**ORAL ARGUMENT NOT YET SCHEDULED**

———————————————————————

**Nos. 25-1045, et al. (consolidated)**

———————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————————————

MISO TRANSMISSION OWNERS, ET AL.,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————————————————————

On Petitions for Review of
Orders of the Federal Energy Regulatory Commission

———————————————————————

**JOINT BRIEF OF PETITIONERS MISO TRANSMISSION OWNERS AND
AMEREN SERVICES COMPANY, AS AGENT FOR UNION ELECTRIC
COMPANY D/B/A AMEREN MISSOURI, AMEREN ILLINOIS COMPANY
D/B/A AMEREN ILLINOIS, AND AMEREN TRANSMISSION COMPANY
OF ILLINOIS**

———————————————————————

*(counsel listed on inside cover)*

August 14, 2025

Christopher R. Jones
Troutman Pepper Locke LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2181
christopher.jones@troutman.com

C. Dixon Wallace, III
Troutman Pepper Locke LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
(804) 697-2279
dixon.wallace@troutman.com

*Attorneys for Petitioners in*
*Nos. 25-1066 and 25-1124*
*Ameren Services Company as agent*
*for Union Electric Company, d/b/a*
*Ameren Missouri, Ameren Illinois*
*Company d/b/a Ameren Illinois, and*
*Ameren Transmission Company of*
*Illinois*

August 14, 2025

Wendy N. Reed
Matthew J. Binette
Ruth M. Porter
WRIGHT & TALISMAN, P.C.
1200 G Street NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
porter@wrightlaw.com

*Attorneys for Petitioners in*
*Nos. 25-1045 and 25-1115*
*the MISO Transmission Owners*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners submit the following:

## A.    Parties and Amici

The parties to this proceeding are as follows:

### 1.    Petitioners

Case Nos. 25-1066 and 25-1124:
Ameren Services Company as agent for Union Electric Company, d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois (collectively "Ameren")

Case Nos. 25-1045 and 25-1115:
The MISO Transmission Owners: ALLETE, Inc., for its operating division Minnesota Power (and its subsidiary Superior Water, L&P); Ameren; American Transmission Company LLC; Cleco Power LLC; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Indianapolis Power & Light Company d/b/a AES Indiana; International Transmission Company d/b/a ITC*Transmission*; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); and Wolverine Power Supply Cooperative, Inc.

Case Nos. 25-1069 and 25-1126:
Louisiana Public Service Commission

2.    **Respondent**

Federal Energy Regulatory Commission ("FERC")

3.    **Intervenors for Petitioners**

None

4.    **Intervenors for Respondent**

Alliant Energy Corporate Services, Inc.
American Municipal Power, Inc.
Association of Businesses Advocating Tariff Equity
Coalition of MISO Transmission Customers
Consumers Energy Company
Illinois Industrial Energy Consumers
Indiana Industrial Energy Consumers, Inc.
Industrial Consumer Groups
Louisiana Public Service Commission
MISO Transmission Owners (including Ameren)
Mississippi Public Service Commission
Missouri Joint Municipal Electric Utility Commission
Missouri Public Service Commission
Norris Electric Cooperative
Organization of MISO States, Inc.
Resale Power Group of Iowa
Rural Electric Convenience Cooperative
Southwestern Electric Cooperative, Inc.
Wisconsin Industrial Energy Group

5.    **Amici**

Transmission Owners are aware of the following parties who may file a joint

amicus brief in this case in support of the MISO Transmission Owner petitioners:

Eversource Energy Service Company on behalf of The Connecticut Light and Power

Company, NSTAR Electric Company, and Public Service Company of New

ii

Hampshire; New England Power Company d/b/a National Grid; Central Maine Power Company and The United Illuminating Company; Unitil Energy Systems, Inc. and Fitchburg Gas and Electric Light Company; Vermont Transco, LLC; Versant Power (f/k/a Emera Maine); and New Hampshire Transmission LLC.

### B.    Rulings Under Review

In Case Nos. 25-1045, 25-1066, and 25-1069:

> *Association of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*, Order on Remand, Docket Nos. EL14-12-016 & EL15-45-015, 189 FERC ¶ 61,036 (Oct. 17, 2024); and
>
> *Association of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. EL14-12-017 & EL15-45-016, 189 FERC ¶ 62,128 (Dec. 19, 2024).

In Case Nos. 25-1115, 25-1124, and 25-1126:

> *Association of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket Nos. EL14-12-017 & EL15-45-016, 190 FERC ¶ 61,184 (Mar. 25, 2025).

### C.    Related Cases

Petitioners are unaware of any pending cases related to the current consolidated case.  However, the issues raised in this brief were first raised by the same group of petitioners (and others) in this Court's review of earlier FERC orders in *MISO Transmission Owners v. FERC*, 45 F.4th 248 (2022).  The Court opted at

the time not to address the Transmission Owner petitioners' issues there because it

vacated the challenged orders on other grounds.  *Id.* at 265.

## PETITIONERS' CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the following Petitioners submit the required Disclosure Statements: ALLETE, Inc., for its operating division Minnesota Power (and its subsidiary Superior Water, L&P); Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois; American Transmission Company LLC; Cleco Power LLC; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Indianapolis Power & Light Company d/b/a AES Indiana; International Transmission Company d/b/a ITC*Transmission*; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); and Wolverine Power Supply Cooperative, Inc. (collectively, "MISO Transmission Owners").

To the extent that the requirement to identify each of the MISO Transmission Owners' general nature and purpose is relevant to this proceeding, *see* Circuit Rule 26.1(b), the MISO Transmission Owners consist of investor-owned transmission companies and cooperative utilities that own electric transmission facilities over which the Midcontinent Independent System Operator, Inc. provides electric transmission service. Each of the MISO Transmission Owners was an active participant in the Federal Energy Regulatory Commission ("FERC") proceedings in which the orders subject to review were issued. Many of the MISO Transmission Owners were named as respondents to the complaints that initiated the proceedings in which the orders under review were issued, and all of them are subject to, and will be affected by, the orders under review. In addition, the MISO Transmission Owners provide the following information required by FRAP 26.1 and Circuit Rule 26.1.

**Corporate Disclosure Statement of
ALLETE, Inc. for its operating division Minnesota Power
(and its subsidiary Superior Water, Light & Power)**

ALLETE, Inc., d/b/a Minnesota Power, which owns Superior Water, Light & Power Company, is a publicly traded company. BlackRock, Inc. and Vanguard each own more than 10% of the shares outstanding of ALLETE, Inc. BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

**Corporate Disclosure Statement of
Ameren Services Company, as agent for Union Electric Company d/b/a
Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and
Ameren Transmission Company of Illinois**

Ameren Services Company is a centralized services company that provides administrative support services to Ameren Corporation and its operating companies, subsidiaries, and affiliates, including the following public utility affiliates:  Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois ("Ameren Companies"). The Ameren Companies are wholly owned subsidiaries of Ameren Corporation, a publicly traded holding company.  At this time, Ameren Services Company believes that T. Rowe Price and the Vanguard Group, Inc. ("Vanguard") (which is not publicly traded) each own more than 10% of the outstanding shares of Ameren Corporation.

**Corporate Disclosure Statement of
American Transmission Company LLC**

American Transmission Company LLC ("American Transmission") is governed by its corporate manager, ATC Management Inc.  American Transmission's owners include utilities, municipalities, municipal electric companies, and electric cooperatives from Wisconsin, Michigan, Minnesota, and Illinois.  Two publicly held corporations (through wholly owned subsidiaries) own

10% or more of American Transmission's ownership interests: WEC Energy Group, Inc. and Alliant Energy Corporation.

**Corporate Disclosure Statement of
Cleco Power LLC**

Cleco Power LLC is a wholly owned subsidiary of Cleco Corporate Holdings LLC, a privately held holding company.

**Corporate Disclosure Statement of
Duke Energy Business Services, LLC for Duke Energy Indiana, LLC**

Duke Energy Indiana, LLC is owned 100% by Duke Energy Indiana Holdco, LLC ("Duke Indiana Holdco"). Duke Indiana Holdco is owned 80.1% by Cinergy Corp. and 19.9% by Epsom Investment Pte. Ltd., ("Epsom Investment"). Cinergy Corp. is owned 100% by Duke Energy Corporation, a publicly traded energy holding company. Epsom Investment is a wholly owned subsidiary of GIC Infra Holdings Pte. Ltd. ("GIC"). GIC is a direct, wholly owned subsidiary of GIC (Ventures) Pte. Ltd. ("GIC Ventures"). GIC Ventures is wholly owned by the Government of Singapore through the Minister for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets.

**Corporate Disclosure Statement of Entergy Arkansas, LLC, Entergy
Louisiana, LLC, Entergy Mississippi, LLC,
Entergy New Orleans, LLC, and Entergy Texas, Inc.**

Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc. ("Entergy Operating

viii

Companies") are utility operating subsidiaries of Entergy Corporation. Entergy Corporation is a registered public utility holding company. Entergy Corporation, either directly or indirectly, owns all or a majority of the outstanding shares of stock of the Entergy Operating Companies.

### Corporate Disclosure Statement of
### Indianapolis Power & Light Company d/b/a AES Indiana

Indianapolis Power & Light Company d/b/a AES Indiana is a subsidiary of IPALCO Enterprises, Inc. ("IPALCO"). IPALCO is majority owned (82.35%) by AES U.S. Investments, Inc., which is majority owned (85%) by AES U.S. Holdings, LLC (IPALCO and AES U.S. Holdings' minority ownership is described immediately below). AES U.S. Holdings is wholly owned by The AES Corporation ("AES"). AES has issued shares of stock and debt securities to the public. Investment funds owned by Vanguard hold over 10% of the publicly traded shares of AES. Vanguard is investor-owned by its fund shareholders.

IPALCO is minority owned (17.65%) by CDP Infrastructures Fund L.P. ("CDP Fund"), and AES U.S. Investments is also minority owned by CDP Fund (15%). CDP Fund is an indirect, minority investor having certain investor protection rights, while AES has majority ownership and control over both AES U.S. Investments and IPALCO. CDP Fund is wholly owned by Caisse de dépôt et placement du Québec, a Canadian institutional investor that manages public and private pension plans and insurance programs in Quebec.

ix

**Corporate Disclosure Statement of
International Transmission Company d/b/a ITC*Transmission*,
ITC Midwest LLC, and Michigan Electric Transmission Company, LLC**

International Transmission Company d/b/a ITC*Transmission* and ITC Midwest LLC are wholly owned subsidiaries of ITC Holdings Corp. Michigan Electric Transmission Company, LLC is an indirect wholly owned subsidiary of ITC Holdings.

ITC Holdings' sole shareholder is ITC Investment Holdings Inc. FortisUS Inc. owns 80.1% of ITC Investment Holdings Inc. FortisUS Holdings Nova Scotia Limited wholly owns FortisUS Inc. Fortis Inc. wholly owns FortisUS Holdings Nova Scotia Limited. Fortis Inc. has no parent company, and no publicly held company has a 10% or greater ownership interest in Fortis Inc. Eiffel Investment Pte. Ltd., which is wholly owned by GIC Ventures, directly owns 19.9% of ITC Investment Holdings. GIC Ventures is affiliated with GIC Private Limited ("GIC Private"), an investment company that manages the Government of Singapore's foreign reserves, and GIC Special Investments Pte. Ltd., the private equity and infrastructure arm of GIC Private. GIC Private and GIC Ventures are each wholly owned by the Government of Singapore through the Ministry for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets. The Ministry for Finance has no parent company, and no

x

publicly held company has a 10% or greater ownership interest in the Ministry for Finance.

## Corporate Disclosure Statement of
## MidAmerican Energy Company

MidAmerican Energy Company ("MidAmerican") is an indirect subsidiary of Berkshire Hathaway Energy Company ("BHEC"). Intermediate parent entities of MidAmerican are MHC Inc. and MidAmerican Funding, LLC. Neither MHC Inc., which is 100% owned by MidAmerican Funding, LLC, nor MidAmerican Funding, LLC, which is owned 100% by BHEC, has publicly traded equity securities. BHEC is a consolidated subsidiary of Berkshire Hathaway Inc., a publicly traded entity, which owns approximately 100% of the voting equity of BHEC.

## Corporate Disclosure Statement of
## Montana-Dakota Utilities Co.

Montana-Dakota Utilities Co. is a subsidiary of MDU Resources Group, Inc. MDU Resources Group, Inc. is a publicly held company whose common stock is publicly traded on the New York Stock Exchange. Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) and BlackRock, Inc. (which is publicly traded) own more than 10% of the outstanding shares of MDU Resources Group, Inc.

**Corporate Disclosure Statement of
Northern Indiana Public Service Company LLC**

Northern Indiana Public Service Company LLC is a wholly owned subsidiary of NIPSCO Holdings II LLC.  NIPSCO Holdings II LLC is owned 80.1% by NIPSCO Holdings I LLC, 15.3841% by BIP Blue Buyer L.L.C., and 4.5159% by BIP Blue Buyer VCOC L.L.C.  NIPSCO Holdings I LLC is a wholly owned subsidiary of NiSource Inc.  NiSource Inc. is a public utility holding company whose common stock is publicly traded on the New York Stock Exchange.

**Corporate Disclosure Statement of
Northern States Power Company, a Minnesota corporation, and
Northern States Power Company, a Wisconsin corporation, subsidiaries of
Xcel Energy Inc.**

Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, are wholly owned utility operating company subsidiaries of Xcel Energy Inc.  The securities of Xcel Energy Inc. are publicly traded.  Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) owns 13.0% of the outstanding shares of Xcel Energy Inc.  Certain operating company subsidiaries of Xcel Energy Inc., including Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, have issued first mortgage bonds and other debt securities.  A complete

xii

list of all debt securities of Xcel Energy Inc. subsidiaries is available at the Xcel Energy Inc. website (www.xcelenergy.com) under Investor Relations.

**Corporate Disclosure Statement of**
**Northwestern Wisconsin Electric Company**

Northwestern Wisconsin Electric Company is an investor-owned utility. No corporation, partnership, or business trust owns a controlling interest in Northwestern Wisconsin Electric Company.

**Corporate Disclosure Statement of**
**Otter Tail Power Company**

Otter Tail Power Company is a wholly owned subsidiary of Otter Tail Corporation. As of July 29, 2025, BlackRock, Inc. and Vanguard each owned more than 10% of the shares outstanding of Otter Tail Corporation. BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

**Corporate Disclosure Statement of**
**Southern Indiana Gas & Electric Company**
**(d/b/a CenterPoint Energy Indiana South)**

Southern Indiana Gas & Electric Company's parent is Vectren, LLC, with Vectren Utility Holdings, LLC as the intermediate parent. Vectren Utility Holdings, LLC is the holder of interest in Southern Indiana Gas & Electric Company. Vectren, LLC is an indirect wholly owned subsidiary of CenterPoint Energy, Inc. CenterPoint Energy, Inc. is a publicly held company.

**Corporate Disclosure Statement of
Wolverine Power Supply Cooperative, Inc.**

Wolverine Power Supply Cooperative, Inc. ("Wolverine") is a not-for-profit, generation and transmission electric cooperative made up of six distribution cooperative members.  Wolverine has two other members, one of which operates solely as a Michigan alternative retail electric supplier and the other of which operates both as a Michigan alternative retail electric supplier and as a FERC-jurisdictional entity.  Wolverine's members are its customers and its owners. Wolverine has no publicly issued stock.

Respectfully submitted,

*/s/ Christopher R. Jones*
Christopher R. Jones
Troutman Pepper Locke LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2181
christopher.jones@troutman.com

C. Dixon Wallace, III
Troutman Pepper Locke LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
(804) 697-2279
dixon.wallace@troutman.com

*Attorneys for Petitioners in*
*Nos. 25-1066 and 25-1124*
*Ameren Services Company as agent for*
*Union Electric Company, d/b/a Ameren*
*Missouri, Ameren Illinois Company d/b/a*
*Ameren Illinois, and Ameren*
*Transmission Company of Illinois*

August 14, 2025

*/s/ Wendy N. Reed*
Wendy N. Reed
Matthew J. Binette
Ruth M. Porter
WRIGHT & TALISMAN, P.C.
1200 G Street NW, Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
porter@wrightlaw.com

*Attorneys for Petitioners in*
*Nos. 25-1045 and 25-1115*
*the MISO Transmission Owners*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION..................................................................2

STATEMENT OF ISSUES ...............................................................................3

STATEMENT OF ADDENDUM .......................................................................3

STATEMENT OF THE CASE...........................................................................3

      I.      FPA SECTION 206...................................................................3

      II.     COMPLAINT PROCEEDINGS ...............................................4

      III.    OPINION 551............................................................................6

      IV.   FERC REOPENS THE RECORD .............................................7

      V.     OPINION 569............................................................................7

      VI.    OPINIONS 569-A AND 569-B ................................................8

      VII.   THIS COURT'S FIRST REVIEW ..........................................8

      VIII.  REMAND ORDERS ................................................................9

SUMMARY OF ARGUMENT ........................................................................10

STANDING .....................................................................................................11

ARGUMENT ...................................................................................................12

      I.      STANDARD OF REVIEW .....................................................12

      II.     FERC IGNORED CLEAR LIMITS ON ITS REMEDIAL
            AUTHORITY BY FIXING A NEW RATE
            RETROACTIVELY AND ORDERING REFUNDS DATING
            BACK MORE THAN EIGHT YEARS ...............................13

            A.     The Remand Order's Silence on FERC's Purported
                 Refund Authority .......................................................14

B. FERC Exceeded its Statutory Authority by Ordering Refunds for More than Eight Years ............................................. 16

 1. FERC Can Only Award Prospective Relief Under Section 206(a) ................................................................ 17

 2. Granting Refunds Also for the Fifteen-Month Period Does Not Save FERC's Action ........................... 19

 3. Opinion 551 Did Not Fix the Rate ................................. 20

 4. FERC Clearly Did More than Grant Rehearing ............. 24

 5. Calling "Legal Error" on Itself Did Not Give FERC Ratemaking Authority Beyond that Granted by Statute ....................................................................... 28

  a. There Is No "Legal Error" Exception to the Remedial Scheme in Section 206(a) ..................... 30

  b. FERC's Boundless Theory of "Legal Error" Lacks Merit ....................................................................... 31

  c. FERC's "Endless Fiddling" with the ROE Was Not Necessary to Correct a Legal Error ............... 33

III. FERC ERRED IN PERMITTING A SECOND COMPLAINT TO CIRCUMVENT THE FPA'S EXPRESS FIFTEEN-MONTH LIMIT ON REFUNDS ....................................................... 37

CONCLUSION ............................................................................. 42

## TABLE OF AUTHORITIES

<u>**COURT CASES**</u>                                                                                   <u>**Page**</u>

*American Gas Ass'n v. FERC*,
  593 F.3d 14 (D.C. Cir. 2010)......................................................................13

*Ameren Services Co. v. FERC*,
  893 F.3d 786 (D.C. Cir. 2018)...................................................................11

*Arkansas Louisiana Gas Co. v. Hall*,
  453 U.S. 571 (1981)...................................................................................17

*Associated Electric Cooperative, Inc., v. FERC*,
  110 F.4th 1079 (8th Cir. 2024) .................................................................17

*Atlantic City Electric Co. v. FERC*,
  295 F.3d 1 (D.C. Cir. 2002).................................................................13, 40

*California Public Utilities Commission v. FERC*,
  20 F.4th 795 (D.C. Cir. 2021)...................................................................13

*City of Anaheim v. FERC*,
  558 F.3d 521 (D.C. Cir. 2009)..................................... 11, 17, 19, 20, 26, 29

*City of Arlington v. FCC*,
  569 U.S. 290 (2013)..............................................................................13, 18

*City of Redding v. FERC*,
  693 F.3d 828 (9th Cir. 2012) ....................................................................17

*City of Winnfield v. FERC*,
  744 F.2d 871, 875 (D.C. Cir. 1984)...........................................................29

*Columbia Gas Transmission Corp. v. FERC*,
  477 F.3d 739 (D.C. Cir. 2007)...................................................................16

*Consolidated Edison Co. of New York, Inc. v. FERC*,
  315 F.3d 316 (D.C. Cir. 2003)...................................................................25

*Electrical District No. 1*,
    774 F.2d 490 (D.C. Cir. 1985)..................................................17, 19, 21, 22, 23

*Emera Maine v. FERC*,
    854 F.3d 9 (D.C. Cir. 2017)..................................................6, 29, 30, 33, 34, 40

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)......................................................................................36

*General Chemical Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987)........................................................................39

*Halverson v. Slater*,
    129 F.3d 180 (D.C. Cir. 1997)........................................................................40

*Hoopa Valley Tribe v. FERC*,
    913 F.3d 1099 (D.C. Cir. 2019)......................................................................12

*Independent Insurance Agents of America v. Hawke*,
    211 F.3d 638 (D.C. Cir. 2000)..................................................................40, 42

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)......................................................................................12

*Louisiana Public Service Commission v. FERC*,
    772 F.3d 1297 (D.C. Cir. 2014)......................................................................17

*Louisiana Public Service Commission v. FERC*,
    866 F.3d 426 (D.C. Cir. 2017)........................................................................31

*MISO Transmission Owners v. FERC*,
    45 F.4th 248 (2022) ..................................................................1, 9, 15, 23, 36

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
    Insurance Co.*,
    463 U.S. 29 (1983)........................................................................................13

xix

*National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*,
    414 U.S. 453 (1974)...................................................................41

*Office of Consumers' Counsel v. FERC*,
    826 F.2d 1136 (D.C. Cir. 1987)...........................................28, 30, 32

*Qi-Zhou v. Meissner*,
    70 F.3d 136 (D.C. Cir. 1995).................................................40

*Tennessee Valley Municipal Gas Ass'n v. FPC*,
    470 F.2d 446 (D.C. Cir. 1972)..............................................30, 32

*Towns of Concord v. FERC*,
    955 F.2d 67 (D.C. Cir. 1992)................................................17

*TNA Merchant Projects, Inc. v. FERC*,
    857 F.3d 354 (D.C. Cir. 2017)..............................................29, 32

*Transwestern Pipeline Co. v. FERC*,
    897 F.2d 570 (D.C. Cir. 1990)...........................................28, 30, 32

*Verso Corp. v. FERC*,
    898 F.3d 1 (D.C. Cir. 2018)..................................................29

*Xcel Energy Services Inc. v. FERC*,
    815 F.3d 947 (D.C. Cir. 2016)..............................................29, 32

## **ADMINISTRATIVE CASES**

*Arizona Public Service Co.*,
    26 FERC ¶ 61,087 (1984)....................................................22

*Arkansas Electric Cooperative Corp. v. ALLETE, Inc.*,
    151 FERC ¶ 61,219 (2015)..................................................5-6

*Arkansas Electric Cooperative Corp. v. ALLETE, Inc.*,
    156 FERC ¶ 61,061 (2016)..................................................37-38

*Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*,
Opinion No. 551, 156 FERC ¶ 61,234 (2016)..................................................6

*Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*,
165 FERC ¶ 61,118 (2018)....................................................7, 8, 25

*Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*,
Opinion No. 569, 169 FERC ¶ 61,129 (2019), *order on reh'g*, Opinion No. 569-A, 171 FERC ¶ 61,154, *order addressing arguments raised on reh'g, & setting aside prior order, in part*, Opinion No. 569-B, 173 FERC ¶ 61,159 (2020), *vacated & remanded sub nom. MISO Transmission Owners v. FERC*, 45 F.4th 248 (D.C. Cir. 2022).........................................7, 8, 27, 35, 39

*Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*,
189 FERC ¶ 61,036 (2024)........................... 2, 5, 6, 9, 10, 12, 15,
.........................................................23, 26, 36, 37

*Ass'n of Businesses Advocating Tariff Equity v. Midcontinent Independent System Operator, Inc.*,
190 FERC ¶ 61,184 (2025)...................................2, 10, 15, 19, 21,
.........................................................22, 28, 30, 37, 38

*Coakley v. Bangor Hydro-Elec. Co.*, Opinion No. 531, 147 FERC ¶ 61,234, *order on paper hearing*, Opinion No. 531-A, 149 FERC ¶ 61,032 (2014), *order on reh'g*, Opinion No. 531-B, 150 FERC ¶ 61,165 (2015), *vacated & remanded sub nom. Emera Me. v. FERC*, 854 F.3d 9 (D.C. Cir. 2017), *order on remand sub nom. ISO New Eng. Inc. v. Bangor Hydro-Elec. Co.*, 161 FERC ¶ 61,031 (2017), *reh'g pending.* .............................................6

*ENE (Env't Ne.) v. Bangor Hydro-Elec. Co.*,
151 FERC ¶ 61,125 (2015)....................................................24

*Louisiana Public Service Commission*,
153 FERC ¶ 61,304 (2015)....................................................18

*PáTu Wind Farm, LLC v. Portland Gen. Elec. Co.*,
    151 FERC ¶ 61,223 (2015)................................................................26

*Quachita Power, LLC*,
    120 FERC ¶ 61,059 (2007)................................................................19

*Southern Co. Services, Inc.*,
    83 FERC ¶ 61,079 (1998)..................................................................37

**STATUTES**
5 U.S.C. § 706..........................................................................................12

16 U.S.C. § 824e ............................................................ 1, 3, 4, 10, 17, 23, 24

16 U.S.C. § 825h..................................................................................16, 28

16 U.S.C. § 825*l*....................................................................................2, 3

Regulatory Fairness Act,
    Pub. L. No. 100-473, 102 Stat. 2299 (1988) ...........................................4, 17

**CONGRESSIONAL MATERIALS**

134 Cong. Rec. 25,128 (1988) ..................................................................18

*Regulatory Fairness Act: Hearing on S. 1567 & H.R. 2858 Before the
    Senate Committee on Energy and Natural Resources*,
    100th Cong. 74-76, 85-87, 91-92, 99-100, 107-08, 115-17, 138,
    295-97 (1987) ..................................................................................18

S. Rep. No. 100-491 (1988) ................................................................18, 39

# GLOSSARY

| Abbreviation/ Term | Definition |
|---|---|
| Briefing Order | *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 165 FERC ¶ 61,118 (Nov. 15, 2018) (JA____-JA____) |
| FERC | Respondent Federal Energy Regulatory Commission |
| First Complaint | Complaint of the Association of Businesses Advocating Tariff Equity, Coalition of MISO Transmission Customers, Illinois Industrial Energy Consumers, Indiana Industrial Consumers, Inc., Minnesota Large Industrial Group, and Wisconsin Industrial Energy Group, Docket No. EL14-12-000 (Nov. 12, 2013) (JA____-JA____) |
| FPA | Federal Power Act |
| Opinion 551 | *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 551, 156 FERC ¶ 61,234 (2016) (JA____-JA____). |
| Opinion 569 | *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 569, 169 FERC ¶ 61,129 (2019) (JA____-JA____). |
| Rehearing Order | *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Order Addressing Arguments Raised on Rehearing, 190 FERC ¶ 61,184 (2025) (JA____-JA____) |

| Abbreviation/ Term | Definition |
|---|---|
| Remand Order | *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Order on Remand, 189 FERC ¶ 61,036 (2024) (JA____-JA____) |
| Remand Orders | The Remand Order and Rehearing Order |
| ROE | Rate of return on equity |
| Second Complaint | Complaint Requesting Fast Track Processing and Motion to Consolidate of Arkansas Electric Cooperative Corporation, Mississippi Delta Energy Agency, Clarksdale Public Utilities Commission, Public Service Commission of Yazoo City, and Hoosier Energy Rural Electric Cooperative, Inc., Docket Nos. EL15-45-000 & EL14-12-000 (Feb. 12, 2015) (JA____-JA____) |
| Transmission Owners | Petitioners the MISO Transmission Owners, including: ALLETE, Inc., for its operating division Minnesota Power (and its subsidiary Superior Water, L&P); Ameren Services Company as agent for Union Electric Company, d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois; American Transmission Company LLC; Cleco Power LLC; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Indianapolis Power & Light Company d/b/a AES Indiana; International Transmission Company d/b/a ITC*Transmission*; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States |

| Abbreviation/ Term | Definition |
|---|---|
| | Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); and Wolverine Power Supply Cooperative, Inc. |

**INTRODUCTION**

These consolidated cases seek review of the Federal Energy Regulatory Commission's ("FERC") unlawful misreading of its authority under Federal Power Act ("FPA") section 206, 16 U.S.C. § 824e, which resulted in FERC: (1) ordering the transmission-owning petitioners here ("Transmission Owners") to pay years of refunds and interest beyond what the statute allows; and (2) entertaining a second complaint that transparently sought only to extend impermissibly the statutory fifteen-month limit on refunds under FPA section 206(b).  These issues were before this Court in *MISO Transmission Owners v. FERC*, 45 F.4th 248 (2022), but the Court declined to address them because it vacated and remanded on other grounds, after finding fault with other aspects of FERC's establishment of a base rate of return on equity ("ROE") for the Transmission Owners.  *Id.* at 265.

In its orders under review, rather than proactively address these legal deficiencies that infected its vacated orders, FERC doubled down and again ordered the backdating of the Transmission Owners' ROE, this time by eight years, and mandated the payment of refunds and interest on that new ROE, set in 2024, to be *applied retroactively* to 2016.  FERC also refused to reconsider its unlawful consideration of a second complaint that sought only to extend the Transmission Owners' refund liability beyond its statutory limits.  The Transmission Owners now

appeal to bring these issues back before the Court for resolution, and ask the Court to vacate these aspects of the orders under review.

## STATEMENT OF JURISDICTION

The Transmission Owners seek review pursuant to FPA section 313(b), 16 U.S.C. § 825*l*(b), of the following FERC orders: *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 189 FERC ¶ 61,036 (2024) (JA____-JA____) ("Remand Order"), and *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 190 FERC ¶ 61,184 (2025) (JA____-JA____) ("Rehearing Order") (collectively, the "Remand Orders").

The Transmission Owners were respondents to the complaints that initiated the proceedings from which the challenged orders were issued, and thus were parties to those proceedings from their initiation. The Transmission Owners timely requested rehearing pursuant to FPA section 313(a), 16 U.S.C. § 825*l*(a), of the Remand Order. Limited Request for Rehearing of the MISO Transmission Owners, Docket Nos. EL15-45-017 & EL14-12-017 (Nov. 18, 2024) (JA____-JA____). The Transmission Owners timely petitioned pursuant to FPA section 313(b), 16 U.S.C. § 825*l*(b), for review of the orders which they now challenge in this Court. Petition for Review of the MISO Transmission Owners, No. 25-1045 (D.C. Cir. Jan. 31, 2025); Petition for Review of the MISO Transmission Owners, No. 25-1115 (D.C. Cir. Apr. 25, 2025); Petition for Review of Ameren Services Company, No. 25-1066

2

(D.C. Cir. Feb. 14, 2025); Petition for Review of Ameren Services Company, No. 25-1124 (D.C. Cir. May 12, 2025).  These petitions seek review from final orders or judgments that disposed of the Transmission Owners' claims.  This Court thus has jurisdiction over the petitions for review under FPA section 313(b), 16 U.S.C. § 825*l*(b).

## STATEMENT OF ISSUES

(1)    Did FERC commit reversible error by "fixing" a new rate retroactively in contravention of FPA section 206, 16 U.S.C. § 824e, and by ordering refunds (with interest) dating back to September 28, 2016, to impose the retroactive rate?

(2)    Did FERC act contrary to its governing statute in failing to summarily dismiss a second complaint that transparently sought only to extend impermissibly the statutory fifteen-month refund period set forth in FPA section 206(b), 16 U.S.C. § 824e(b)?

## STATEMENT OF ADDENDUM

Pertinent statutes are set forth in an addendum to this brief.

## STATEMENT OF THE CASE

## I.    FPA SECTION 206

FPA section 206, 16 U.S.C. § 824e, governs FERC's authority to investigate existing public utility rates, and states:

> Whenever [FERC], after a hearing held upon its own motion or upon complaint, shall find that any rate . . .

3

> demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of [FERC] . . . is unjust, unreasonable, unduly discriminatory or preferential, [FERC] shall determine the just and reasonable rate . . . *to be thereafter observed and in force, and shall fix the same by order*.

16 U.S.C. § 824e(a) (emphasis added).  FERC is thus empowered to investigate whether rates are unjust and unreasonable and remedy any such rates found by prospectively setting a new rate.  *See id.*  In addition to this prospective relief, FERC may also require refunds for a limited period.  Section 206(b) states:

> Whenever [FERC] institutes a proceeding under this section, [FERC] shall establish a refund effective date. . . . At the conclusion of any proceeding under this section, [FERC] may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which [FERC] orders to be thereafter observed and in force[.]

16 U.S.C. § 824e(b).  Congress added FPA section 206(b) in the Regulatory Fairness Act of 1988 ("1988 Act").  Regulatory Fairness Act, Pub. L. No. 100-473, 102 Stat. 2299 (1988).

## II.    COMPLAINT PROCEEDINGS

As explained above, the FPA empowers FERC to determine the just and reasonable rates of utilities like the Transmission Owners, including the ROE component of those rates.  This case concerns two complaints challenging the

4

Transmission Owners' previously approved ROE as unjust and unreasonable under FPA section 206.

A group of transmission customers filed the first complaint on November 12, 2013. Complaint of the Association of Businesses Advocating Tariff Equity, et al., Docket No. EL14-12-000 (Nov. 12, 2013) (JA____-JA____) ("First Complaint"); Remand Order at P 3 (JA____). FERC set the First Complaint for hearing before an administrative law judge and established November 12, 2013, as the refund effective date. Remand Order at P 3 (JA____). The FPA section 206(b) fifteen-month refund period expired on February 11, 2015.

The next day, on February 12, 2015, a new set of complainants (all of whom were active parties in the First Complaint proceeding and fully entitled to any relief provided in that proceeding) filed a second complaint challenging the Transmission Owners' unchanged ROE. Complaint Requesting Fast Track Processing and Motion to Consolidate of Arkansas Electric Cooperative Corporation, et al., Docket Nos. EL15-45-000 & EL14-12-000 (Feb. 12, 2015) (JA____-JA____) ("Second Complaint"); Remand Order at P 5 (JA____). FERC set the Second Complaint for hearing and established February 12, 2015, as the refund effective date, over the Transmission Owners' objections that the Second Complaint was barred by the fifteen-month statutory limit on refunds. *See Ark. Elec. Coop. v. ALLETE, Inc.*, 151

5

FERC ¶ 61,219, at P 32 (2015) (JA____-JA____); Remand Order at PP 5-6 (JA____-JA____).

### III.    OPINION 551

FERC issued Opinion 551 addressing the First Complaint on September 28, 2016. *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 551, 156 FERC ¶ 61,234 (2016) (JA____-JA____). Opinion 551 found the Transmission Owners' base ROE unjust and unreasonable, ordered it reduced from 12.38% to 10.32%, and required refunds for the fifteen-month FPA section 206(b) refund period. *Id.* at P 9, ordering para. C (JA____, JA____).

Before FERC acted on Opinion 551 rehearing requests or on the Second Complaint (whose original evidentiary hearing had then concluded), this Court decided *Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) ("*Emera Maine*"), which vacated and remanded FERC orders on a complaint regarding the ROE for transmission owners in New England. The orders *Emera Maine* vacated (i.e., FERC's Opinion 531 and its sequels[1]) relied upon a methodology and reasoning similar to those FERC employed in Opinion 551.

---

[1]     *Coakley v. Bangor Hydro-Elec. Co.*, Opinion 531, 147 FERC ¶ 61,234, *order on paper hearing*, Opinion 531-A, 149 FERC ¶ 61,032 (2014), *order on reh'g*, Opinion 531-B, 150 FERC ¶ 61,165 (2015), *vacated & remanded sub nom. Emera Me. v. FERC*, 854 F.3d 9 (D.C. Cir. 2017), *order on remand sub nom. ISO New Eng. Inc. v. Bangor Hydro-Elec. Co.*, 161 FERC ¶ 61,031 (2017), *reh'g pending*.

## IV.    FERC REOPENS THE RECORD

On November 15, 2018, following *Emera Maine*, FERC *sua sponte* reopened the record in the two pending complaint proceedings here to consider an entirely new methodology for evaluating and setting ROEs, using four financial models instead of relying on one as it had done in Opinion 551. *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 165 FERC ¶ 61,118, at P 16 (2018) (JA____-JA____) ("Briefing Order").    Parties submitted briefs and additional paper evidence in February and April 2019.

## V.    OPINION 569

On November 21, 2019, FERC issued Opinion 569, addressing the paper hearing record and ruling on the First Complaint and Second Complaint. *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 569, 169 FERC ¶ 61,129 (2019) (JA____-JA____).    Opinion 569 neither adopted the Briefing Order's four-model approach nor reverted to the Opinion 551 approach. Instead, it adopted a two-model approach, giving equal weight to the previously used discounted cash flow model and a new model, the capital asset pricing model. *Id.* at P 427 (JA____).    That new approach yielded an ROE of 9.88% for the First Complaint.

For the Second Complaint, FERC treated the 9.88% ROE established in the First Complaint as the operative rate for the Second Complaint.  *Id.* at P 575

(JA____).  FERC concluded that the 9.88% ROE was not unjust and unreasonable on the merits and dismissed the Second Complaint.  *Id.* (JA____).

## VI.  OPINIONS 569-A AND 569-B

On May 21, 2020, FERC issued Opinion 569-A, addressing rehearing of Opinion 569.  *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 569-A, 171 FERC ¶ 61,154 (2020) (JA____-JA____).  Opinion 569-A changed the ROE methodology yet again, expanding it from Opinion 569's two-model approach to a three-model approach and fixing, yet again, a new replacement ROE, this time 10.02%.  *Id.* at PP 2-3 (JA____-JA____).  FERC also affirmed its dismissal of the Second Complaint.

Opinion 569-B further modified FERC's new approach on November 19, 2020, but did not change the ROE resulting from the First Complaint or Second Complaint proceedings.  *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion 569-B, 173 FERC ¶ 61,159, at P 3 (2020) (JA____).

## VII.  THIS COURT'S FIRST REVIEW

Multiple parties petitioned this Court for review of Opinions 569, 569-A, and 569-B challenging various aspects of the orders.  The Transmission Owners challenged FERC's effort to backdate the new rate and to entertain improper serial complaints, and other parties challenged FERC's new ROE methodological choices.

8

This Court found that most of the ROE methodology challenges lacked merit, but found that FERC failed to explain its decision to add a "risk premium" model in Opinion 569-A after initially rejecting it in Opinion 569. *MISO Transmission Owners*, 45 F.4th at 264. Accordingly, the Court vacated the orders and remanded for further proceedings. *Id.* Importantly, however, because the Court otherwise vacated FERC's orders on ROE methodology, it opted not to reach the Transmission Owners' arguments about FERC's unlawful backdating of the new rate and entertaining serial complaints. *Id.* at 265.

## VIII. REMAND ORDERS

Two years after this Court's decision, FERC issued the Remand Order on October 17, 2024. Remand Order (JA____-JA____). FERC found the record did not support use of the risk premium model and removed it from the calculation, resulting in an ROE of 9.98%. *Id.* at PP 23-25 (JA____-JA____).

FERC implemented the new ROE in two ways. First, FERC required the Transmission Owners to re-calculate refunds for the fifteen-month refund period of November 12, 2013, through February 11, 2015, and to issue refunds for the difference between the 10.02% ROE set in Opinion 569-A and the 9.98% ROE set by the Remand Order (since the Transmission Owners had already provided refunds for the difference between 12.38% and 10.02% as previously ordered). *Id.* at ordering para. C (JA____). Second, FERC ordered that the 9.98% ROE be effective

9

retroactive to September 28, 2016, the date of Opinion 551, and required the Transmission Owners to issue refunds for the difference between 10.02% and 9.98%, for a now-expanded eight-year refund period from Opinion 551's issuance to the Remand Order. *Id.* at ordering para. B (JA____). Multiple parties sought rehearing of the Remand Order.

FERC issued the Rehearing Order on March 25, 2025, sustaining the Remand Order. Rehearing Order (JA____-JA____).

## SUMMARY OF ARGUMENT

FERC exceeded its statutory authority by backdating the ROE it set in the Remand Order all the way back to September 2016 and by ordering retroactive refunds (with interest) for that eight-year period, notwithstanding that FPA section 206(a) only permits FERC to fix a new rate prospectively "to be thereafter observed and in force." 16 U.S.C. § 824e(a). FERC avers that ordering eight years of retroactive refunds is lawful because Opinion 551 sufficiently "fixed" the new rate even though the final ROE was not known until FERC issued the Remand Order in late 2024. Congress spoke clearly on section 206 refund remedies in the 1988 Act, creating a single fifteen-month refund remedy. FERC's additional refund directive under review is thus *ultra vires*.

This Court has curtailed FERC's previous attempts to disregard the clear limits on its remedial authority and "mangle" the operation of FPA section 206. In

10

so doing, this Court has already rejected the notion that "'prospective' can mean a date many months earlier than the date of the [FERC] order fixing a rate." *City of Anaheim v. FERC*, 558 F.3d 521, 525 (D.C. Cir. 2009) ("*Anaheim*"). The Court should do so again here.

FERC also violated FPA section 206(b) by entertaining a Second Complaint concerning the same rate despite the FPA's express fifteen-month limit on refunds. The complainants filed the identical analysis to support both their Second Complaint and their position in the First Complaint proceeding, and timed their filing to coincide with the end of the First Complaint's refund period, demonstrating that the Second Complaint's sole purpose was to achieve an end-run around the FPA's express fifteen-month limit on refunds and to extend refund availability to thirty months. FERC should have rejected the Second Complaint outright as barred by law, and committed reversible error by failing to do so.

FERC's orders, therefore, should be vacated on these grounds.

## STANDING

Each of the Transmission Owners has standing because the Transmission Owners and their rates are the object of the agency's action in the Remand Orders. *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025); *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 792 (D.C. Cir. 2018) (stating a utility that was the "object of the agency's action" under review had standing and articulating the principle that

11

"a regulated party generally has standing to challenge an agency action regulating its behavior"). The challenged orders harm the Transmission Owners by reducing their rates, requiring unlawful refunds and interest, and subjecting the Transmission Owners to illegal successive complaints. *See* Remand Order at P 33 (JA____). Unlawful refunds lower the Transmission Owners' revenues and, in particular in the case of ROE, reduce the funds available to pay equity investors or reinvest in new transmission infrastructure. A decision by this Court vacating FERC's Remand Orders on these issues will redress those harms.

## ARGUMENT

## I.    STANDARD OF REVIEW

Courts review FERC orders under the Administrative Procedure Act ("APA"), which empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory . . . authority, or limitations, or short of statutory right; . . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (C), (E); *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1102 (D.C. Cir. 2019). In determining whether an agency's interpretation of its governing statute is contrary to law, courts must exercise "independent judgment" and "apply[] all relevant interpretive tools" to reach "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373, 394, 400 (2024). Since FERC is "a creature

12

of statute," it has "only those authorities conferred upon it by Congress," such that the Court must set aside any FERC action taken "[i]n the absence of statutory authorization." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (citation omitted). Agency actions that exceed statutory authority are *ultra vires*. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

Further, under the APA's arbitrary-and-capricious standard, "[FERC's] discretion is . . . bounded by the requirements of reasoned decision making." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010). This requires FERC to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted), and "to demonstrate that it has made a reasoned decision based upon substantial evidence in the record," *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th 795, 800 (D.C. Cir. 2021) (citation omitted).

## II. FERC IGNORED CLEAR LIMITS ON ITS REMEDIAL AUTHORITY BY FIXING A NEW RATE RETROACTIVELY AND ORDERING REFUNDS DATING BACK MORE THAN EIGHT YEARS

FERC's Remand Orders require the Transmission Owners to adopt a 9.98% ROE. Instead of charging the rate prospectively as of the date of the Remand Order, FERC's 2024 decision made the new ROE effective retroactively as of September 28, 2016, the date FERC issued Opinion 551. To implement that ruling, FERC

13

ordered the Transmission Owners to issue refunds for two distinct periods: (a) the fifteen-month statutory refund period (i.e., November 12, 2013, through February 11, 2015); and (b) *also* for the roughly eight-year period from September 28, 2016, to the date of its Remand Order. The former was lawful; the latter was not.

Backdating the new ROE *eight years* finds no support in the statute and is thus *ultra vires*. The limits on FERC's refund authority under FPA section 206 as amended by the 1988 Act are unambiguous. At the conclusion of a rate proceeding, FERC may only do two things: (1) fix the rate to be "thereafter observed" under section 206(a); and (2) demand retroactive refunds to address the pendency of the rate litigation under section 206(b), but only for the *fifteen-month* period from the "refund effective date." Congressional intent is clear. FERC's only ability to apply new rates retroactively is to grant refunds for a fifteen-month period. While the Court did not reach this question the last time, the issue is squarely presented now.

### A. The Remand Order's Silence on FERC's Purported Refund Authority

Despite FERC clearly knowing its expansive theory of its refund authority was under challenge by virtue of the Transmission Owners' appeal in *MISO Transmission Owners*, which this Court declined to reach, FERC's Remand Order provided no legal defense of its refund authority, save a scant footnote. FERC finally

offered its purported legal justification in the Rehearing Order, but even then only as rebuttal to rehearing requests.

FERC's election to say *nothing* on the issue in the Remand Order, save a single footnote citation to a vacated order, was much more than "a byproduct of the procedural posture of the proceeding," as FERC now insists.  Rehearing Order at P 54 (JA____); Remand Order at P 33 & n.85 (JA____).  This Court *vacated* FERC's prior orders in this case, *MISO Transmission Owners*, 45 F.4th at 264 ("We . . . vacate FERC's orders."); *see* Remand Order at P 33 & n.85 (JA____), but specifically reserved the issue for potential future adjudication, *MISO Transmission Owners*, 45 F.4th at 265 ("*Until* FERC sets a new Return, a decision on the refund issue will not alter the parties' rights and obligations." (emphasis added)).  It was therefore incumbent upon FERC to articulate a legal theory for such a consequential interpretation of its statutory authority.  Instead, FERC's Remand Order dodged the issue with a footnote to a vacated order.

FERC's evasion was consequential because the Transmission Owners were left with no rationale to contest on rehearing, leaving them to merely assume, based on the vacated orders, what FERC presumed its authority to be.  In turn, FERC only

15

had to react to the Transmission Owners' rehearing arguments rather than proffering a legal justification of its own.[2]

### B.      FERC Exceeded its Statutory Authority by Ordering Refunds for More than Eight Years

In the Rehearing Order, FERC finally responded to the Transmission Owners' refund arguments, but never clearly articulated its operative theory of section 206. However muddled, FERC's argument seems to presume that all of its actions subsequent to Opinion 551 were part of the rehearing process such that Opinion 551 still "fixed" the new rate, even though the finally-set 9.98% (and the methodology for setting it) was not revealed until 2024. FERC claims that because Opinion 551 specified *a* rate, that was enough. And FERC argues it did not violate section 206(b) because it did order fifteen months of refunds (ignoring that it separately ordered over ninety-six *additional* months of refunds). Separately, summoning its section 309 authority, 16 U.S.C § 825h, FERC also claims it was correcting a series of compounding "legal errors" in each order subsequent to Opinion 551. None of these arguments hold water, and they are contradictory in any event.

---

[2]    FERC's failure to offer any explanation on this issue in the Remand Order also means the Transmission Owners are "not jurisdictionally barred from urging any objection here" that was not included in their rehearing request. *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 744 (D.C. Cir. 2007).

16

*1.     FERC Can Only Award Prospective Relief Under Section 206(a)*

Under section 206(a), if FERC finds an existing rate to be unjust and unreasonable, it must "fix" a new just and reasonable rate "to be *thereafter* observed and in force." 16 U.S.C. § 824e(a) (emphasis added). This Court and others have repeatedly held that section 206(a) "allows [FERC] to fix rates and charges, *but only prospectively*." *Anaheim*, 558 F.3d at 524 (emphasis added) (citing *Towns of Concord v. FERC*, 955 F.2d 67, 72 (D.C. Cir. 1992)); *see also, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981); *Assoc. Elec. Coop., v. FERC*, 110 F.4th 1079, 1088 (8th Cir. 2024); *City of Redding v. FERC*, 693 F.3d 828, 838 (9th Cir. 2012).

The prospective-only nature of 206(a) is further reinforced by the addition of section 206(b) via the 1988 Act, which created the sole retroactive remedy available under section 206. It conferred upon FERC new authority to order retroactive refunds for the difference between the challenged rate and the newly fixed rate, but *only* for a fifteen-month period following the refund effective date. 1988 Act § 2. Indeed, prior to the 1988 Act's enactment, it was well understood that FERC "clearly ha[d] no power under [section] 206 to order reparations for excessive rates collected in the past." *Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 494 (D.C. Cir. 1985) ("*Electrical District*"); *see also La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1302 (D.C. Cir. 2014) ("The FPA did not authorize refunds in section 206 proceedings until the 1988 amendments made by the [1988] Act."). Additionally,

17

the 1988 Act's legislative history demonstrates Congress considered and expressly rejected more open-ended refund availability. *See* 134 Cong. Rec. 25,128 (daily ed. Sept. 23, 1988) (Rep. Moorhead noting that the Senate amended the bill to limit the retroactive effect of a section 206 proceeding); S. Rep. No. 100-491, at 6 (1988) (discussing the amendment placing a fifteen-month refund limitation on section 206 proceedings); *see also Regulatory Fairness Act: Hearing on S. 1567 & H.R. 2858 Before the S. Comm. on Energy & Nat. Res.*, 100th Cong. 74-76, 85-87, 91-92, 99-100, 107-08, 115-17, 138, 295-97 (1987) (testimony addressing concerns regarding potential open-ended refund liability and emphasizing limits imposed by amended section 206(b) based on a fifteen-month refund period).

Under the section 206 framework as amended by the 1988 Act, refunds ordered beyond the fifteen-month statutory period under section 206(b) are *ultra vires* (excluding cases of "dilatory behavior" by the utility, which is not alleged here). *City of Arlington*, 569 U.S. at 297, 301 (for agencies, both the "power to act and how they are to act are authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. . . . [T]he question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not"). In fact, outside of this case, FERC has consistently recognized the fifteen-month limitation on its refund authority. *See La. Pub. Serv. Comm'n*, 153 FERC ¶ 61,304, at P 24 (2015) ("The

18

[fifteen]-month limitation on refunds is a limitation on refunds in the section 206 proceeding."); *Quachita Power, LLC*, 120 FERC ¶ 61,059, at P 13 (2007) (noting that section 206 imposes a "*strict time limitation*") (emphasis added)).

As for the requirement to "fix" a new rate, this Court has explained that "when fixing a rate, it is not enough for FERC "to prescribe the legal and accounting principles which, properly applied, will yield one particular rate" because the statute "requires the rate itself to be specified." *Electrical District*, 774 F.2d at 492. Here, FERC did not fix the rate until October 17, 2024, the date it issued the Remand Order. Starting then, FERC could *only*: (i) order that the 9.98% ROE "be thereafter observed" under section 206(a); and (ii) order refunds under section 206(b) for the fifteen-month period established by the First Complaint (November 2013 to February 2015). FERC had no authority to order refunds dating more than *eight years* back to September 2016. *See, e.g.*, *Anaheim*, 558 F.3d at 522 ("[R]etroactive rate increases of this kind flatly violate the plain language of [section] 206(a).").

### 2.    Granting Refunds Also for the Fifteen-Month Period Does Not Save FERC's Action

In the Rehearing Order, FERC bristles at the notion that it violated section 206(b) because it clearly ordered refunds for the appropriate fifteen-month period of November 2013 to February 2015. Rehearing Order at P 67 (JA____). FERC misses the point entirely. It is not that FERC unlawfully stretched or miscalculated the fifteen-month period. The problem is that FERC ordered over *ninety-six additional*

19

months of refunds despite the express fifteen-month limit. FERC treats section 206(b) as an affirmative grant of refund authority that can be supplemented in its judgment, instead of the *limit* on remedial refunds that it clearly is.

FERC's attempt to distinguish the fifteen-month refund directive from the separate ninety-six-month refund directive fails as well under section 206(a) because of the prospective-only nature of rate setting under that subsection. *Anaheim*, 558 F.3d at 523 ("On its face, [section] 206(a) prohibits retroactive adjustment of rates. And not surprisingly, the Supreme Court and this Court have read this language to mean what it says."). Neither sections 206(a) or (b) authorized FERC to elongate the refund period.

### 3.    *Opinion 551 Did Not Fix the Rate*

Even if one subscribes to FERC's theory that the section 206(b) refund limitations have no bearing on the contested eight-year refund directive, FERC must then ground its action in section 206(a). For FERC to prevail, the Court must find that Opinion 551 "fixed" the rate to be thereafter observed. There is no reasonable path to that conclusion.

*First,* to state the obvious, Opinion 551 chose a rate of 10.32%. Barring a further remand on the methodology by the Court here, the Remand Order established 9.98% to be the rate thereafter observed, which was "determined" in 2024, not 2016.

And, along the way, FERC would disavow not only the rate it chose in Opinion 551 but also the methodology it used to set that rate.

*Second, Electrical District* held that section 206 "requires the rate itself to be specified" for an order to "fix" a rate, and faulted FERC's order on review for lacking the "necessary predictability." *Electrical District*, 774 F.2d at 492-93. In the Rehearing Order, FERC attempts to side-step *Electrical District* by arguing that Opinion 551 did "fix" a rate because it included "a specified numerical rate that could be implemented and collected." Rehearing Order at PP 59-60 (JA____-JA____). Stated another way, FERC asks the Court to read *Electrical District* to mean as long as FERC picks *some* numerical rate, one must ignore all of FERC's subsequent actions disavowing that rate through changed methodologies, further record development, and changing policy preferences. But FERC ignores the *Electrical District* Court's clear concerns about "uncertainty, increased litigation and delay." *Electrical District*, 774 F.2d at 493. As the Court held, "[FERC] cannot fix a rate, as it purports to have done here, without ever seeing it." *Id.* at 495.

*Third,* FERC seeks cover under its rehearing process, arguing that "rate changes required in section 206 proceedings should take effect as of the date of the order setting rates, *not* the date of the rehearing—regardless of whether and to what extent the rehearing order changes the rates originally allowed." Rehearing Order at P 56 (JA____). FERC purported to fix a rate (i.e., 10.32%) in Opinion 551, but

21

subsequently undid its work by repudiating the methodology it relied on and applying a *new* methodology establishing a *different* rate in Opinion 569 after additional record development.  Indeed, FERC wholly rejected the Opinion 551 methodology in Opinion 569, and then modified its methodology twice in Opinions 569-A and 569-B, and again in the Remand Order.  Given all these intervening events, it cannot plausibly be argued that Opinion 551 was the date the rate was fixed.  And even if one ignores all the other stops along the way (e.g., setting a 9.88% ROE in Opinion 569, setting a 10.02% ROE in Opinions 569-A and 569-B, and setting a 9.98% ROE in the Remand Order, amongst others) FERC's legal theory rests on the absurd notion that Opinion 551—which FERC itself overturned and this Court vacated in *MISO Transmission Owners*—"fixed" the new rate of 9.98% FERC established in the Remand Order.

The only support FERC offers for its proposition is its own 1984 order in *Arizona Public Service*, which this Court *vacated* in *Electrical District*.  *See id.* (quoting *Ariz. Pub. Serv. Co.*, 26 FERC ¶ 61,087, at 61,221 (1984)) (JA____). Notwithstanding FERC's argument to the contrary, Rehearing Order at P 56 (JA____), this Court *did* "vacate" and "disturb" this aspect of *Arizona Public Service* in its *Electrical District* decision, in which this Court acknowledged FERC "clearly has no power under [section] 206 to order reparations for excessive rates collected in the past." *Electrical District*, 774 F.2d at 494.  And although the 1988 Act gave

FERC *some* power "to order reparations for excessive rates collected in the past" under section 206(b), it set a fifteen-month window for FERC to do so. *Id.* Moreover, for FERC to succeed on this point, the Court would have to agree that Opinion 551 did *more* to set the rates than the initial order at issue in *Arizona Public Service.* The *Electrical District* Court found that FERC did not "fix" new rates if it only set forth the "basic principles pursuant to which the new rates are to be calculated." *Id.* at 493. Opinion 551 clearly did *less* to set rates than FERC did in *Arizona Public Service*, since FERC abandoned whatever rate work it did in Opinion 551 and jettisoned both the Opinion 551 rate and the methodology it used to determine it.

*Fourth*, the Remand Order made a refreshed section 206 "step one" determination that the "existing" ROE of 12.38% is no longer just and reasonable. Remand Order at P 30 (JA____) ("Having determined the composite zone of reasonableness, we now turn to considering whether the MISO TOs' 12.38% ROE may be found unjust and unreasonable pursuant to the first prong of section 206."); *see also MISO Transmission Owners*, 45 F.4th at 253 ("At step one [under section 206], FERC decides if the old rate is unjust and unreasonable. If so, then FERC proceeds to step two and sets a new rate.") (citing 16 U.S.C. § 824e(a)). FERC's logic would require one to believe FERC can complete the first step of its section

206 analysis *in 2024*, but that it completed the *second* step of its analysis *in 2016*. The absurdity of FERC's logic is self-evident.

*Fifth*, FERC may only "fix" a new rate upon the conclusion of FERC's investigatory process. Section 206(a) explicitly provides that FERC may "*after a hearing* . . . determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a) (emphasis added). Section 206(b) similarly only allows FERC to order refunds for the fifteen-month period "*[a]t the conclusion of any proceeding* under this section." 16 U.S.C. § 824e(b) (emphasis added). FERC itself has recognized that the conclusion of evidentiary proceedings is the prerequisite for both fixing a new rate under section 206(a) and ordering refunds under section 206(b). *See ENE (Env't Ne.) v. Bangor Hydro-Elec. Co.*, 151 FERC ¶ 61,125, at P 33 (2015) ("The decision to order refunds, or not order refunds, in a section 206 proceeding is *made at the conclusion of such a proceeding*.") (emphasis added) (quoting 16 U.S.C. § 824e(b)). As detailed in the following section, Opinion 551 was not the end of the investigatory process.

### 4.    *FERC Clearly Did More than Grant Rehearing*

Even if the Court concludes that FERC should have some ability to revise a "fixed" rate on rehearing, the record demonstrates FERC went far beyond merely granting rehearing of Opinion 551. After this Court's *Emera Maine* decision, FERC's Briefing Order opened a subsequent "paper hearing" in the Opinion 551

24

docket. Briefing Order at P 20 (JA____). In the Briefing Order, FERC explained it was proposing a "*new framework* for evaluating whether an existing ROE remains just and reasonable for purposes of the first prong of FPA section 206" and a new "*proposed framework* for establishing a new just and reasonable ROE, where the existing ROE has been shown to be unjust and unreasonable (i.e., the second prong of the FPA section 206 analysis)." *Id.* at PP 18, 24 (JA____, JA____) (emphasis added). FERC proposed to change the threshold for dismissing a complaint and the financial models upon which it would rely, expanding from one model to four. *Id.* at PP 17-18 (JA____-JA____). FERC also re-opened the record to new evidence, *id.* at P 62 (JA____), and acknowledged that the Briefing Order was part of the *ongoing adjudication* of the First Complaint and Second Complaint. *See id.* at P 62 & n.110 (citing *Consol. Edison Co. of N.Y., Inc. v. FERC*, 315 F.3d 316, 323 (D.C. Cir. 2003)) (JA____).

After the parties submitted briefs and additional evidence in February and April 2019, FERC issued Opinion 569 on November 23, 2019, and adopted a two-model approach for evaluating an existing ROE and, when warranted, fixing a new replacement ROE. FERC subsequently issued Opinion 569-A on May 21, 2020, which again changed the ROE methodology by adopting a three-model approach. Thereafter, FERC issued Opinion 569-B on November 19, 2020, which made additional modifications to FERC's approach. Lastly, FERC issued the Remand

25

Order in October 2024 following this Court's vacatur of FERC's prior orders in *MISO Transmission Owners.* All told, more than eight years passed between FERC's issuance of Opinion 551 and the Remand Order, during which FERC engaged in wide-ranging policy development and finally set a 9.98% base ROE. Remand Order at PP 33, 42 (JA____, JA____). The Rehearing Order, in which FERC affirmed its Remand Order findings, came even later in March 2025.

All of the additional record development and changes to FERC's methodology that took place for years after Opinion 551 make clear that FERC was doing much more than simply granting rehearing. First, the Briefing Order's acknowledgment that the proceedings were an ongoing adjudication is fatal to FERC's attempt to backdate the new 9.98% rate set in the Remand Order to the date of Opinion 551. FERC cannot have "fixed" a rate under section 206(a) if the hearing was not complete and the proceeding was ongoing. *See Anaheim*, 558 F.3d at 522 ("[W]e give no deference to an agency interpretation that fails to comport with the plain statutory language. The precise words of the statutory text matter."). Additionally, FERC has a general rule prohibiting parties from introducing new arguments or evidence on rehearing. *See, e.g.*, *PáTu Wind Farm, LLC v. Portland Gen. Elec. Co.,* 151 FERC ¶ 61,223, at P 42 (2015) (stating that FERC "will reject as untimely the new Exhibit" which was included in a request for rehearing, because "[p]arties are not permitted to introduce new evidence for the first time on rehearing

26

since such practice would allow an impermissible moving target, and would frustrate needed administrative finality"). The Briefing Order's explicit invitation to parties to introduce new evidence can only be construed as a re-opening of the record to "un-fix" the ROE that FERC had purported to fix in Opinion 551, and not merely a run-of-the-mill rehearing as FERC uses the term.

In fact, FERC admitted that its methodological change from Opinion 551 to Opinion 569 was not based on any argument made by a party in a valid rehearing request; rather FERC was largely acting *sua sponte* in adopting the changes it ordered. *See* Opinion 569-A at PP 243-44 (JA____-JA____) ("While it may be true that a party did not explicitly request that [FERC] reach each and every exact decision that it made in Opinion No. 569, [FERC] nonetheless acted within its discretion to reach its conclusions . . . ."). As one Commissioner at the time put it, FERC engaged in "endless fiddling" with the ROE over that multi-year span. *Id.*, concur & dissent op. (Commissioner Glick) at § I (JA____-JA____). Following *Emera Maine* through FERC's issuance of Opinion 569-A, FERC "added new models, removed some of those models, tweaked some of those models, introduced new inputs, modified existing inputs, introduced new screens, modified existing screens, and even altered how [it] places the ROE within the zone of reasonableness." *Id.,* concur & dissent op. (Commissioner Glick) at P 7 (JA____) (footnotes omitted). The additional changes adopted in the Remand Order only

27

added to the "endless fiddling" with the ROE that FERC has only now purportedly "fixed" in that order.

In short, FERC cannot possibly have "fixed" a new rate in Opinion 551 simply by stating a new ROE that it subsequently and *sua sponte* repudiated and changed several times.  FERC's "endless fiddling" demonstrates that whatever rate was declared in Opinion 551 was *un-fixed* numerous times in the subsequent history of this case leading up to and following *MISO Transmission Owners*.

> 5.      *Calling "Legal Error" on Itself Did Not Give FERC Ratemaking Authority Beyond that Granted by Statute*

FERC also argues its nearly decade-long refund directive is lawful because "it is necessary to correct a legal error" and "*Electrical District* does not apply when legal error is involved."  Rehearing Order at PP 53, 62 (JA____, JA____).  In support, FERC cites *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C. Cir. 1990) ("*Transwestern*"), and *Office of Consumers' Counsel v. FERC*, 826 F.2d 1136 (D.C. Cir. 1987) (*per curiam*) ("*Consumers' Counsel*").  FERC's argument fails on many levels.

As an initial matter, the FPA makes no mention of "legal error" or alludes to any ability for FERC to order refunds to correct such errors.  FPA section 309 grants FERC "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of" the FPA.  16 U.S.C. § 825h.  The legal error "doctrine"

28

(such as it is) has evolved through caselaw.  This Court has noted the "expansive" nature of FERC's ability under section 309 "to advance remedies not expressly provided by the FPA," but has equally emphasized that such remedies are lawful only "*as long as they are consistent with the Act*."  *Verso Corp. v. FERC,* 898 F.3d 1, 10 (D.C. Cir. 2018) (emphasis added).  Each of the contemporary legal error cases involve implementing—not overriding—clear statutory limits.  *Verso* involved FERC's ability to require surcharges from one set of parties in a cost allocation setting in order to give effect to FERC's ability to provide refunds to other parties *within the statutory fifteen-month refund period* and involved no legal error on FERC's part.  *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 950-52 (D.C. Cir. 2016) ("*Xcel*"), addressed legal error in the context of section 205 (i.e., FERC's failure to suspend a rate filed under section 205), not section 206, and therefore has no bearing on FERC's remedial authority under section 206.  *See Emera Maine*, 854 F.3d at 24 ("The purpose of section 206 is 'quite different' from that of section 205.") (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984)); *Anaheim*, 558 F.3d at 524-25 ("[Section] 206 involves an entirely different—and stricter—set of procedures than [section] 205.").  And in *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 360 (D.C. Cir. 2017) ("*TNA*"), which also did not concern section 206, this Court merely affirmed that section 309 authorizes FERC to recoup refunds from a

29

non-jurisdictional utility after FERC misinterpreted FPA sections 201 and 205 by deciding the refund it previously provided under section 205 was unlawful.

### a. There Is No "Legal Error" Exception to the Remedial Scheme in Section 206(a)

Apparently aware that this Court's "legal error" cases are not section 206 cases, FERC cites *Transwestern* and *Consumers' Counsel* for the proposition that "*Electrical District* does not apply when legal error is involved." Rehearing Order at P 62 (JA____). However, these cases, along with *Tenn. Valley Mun. Gas Ass'n v. FPC*, 470 F.2d 446 (D.C. Cir. 1972) ("*Tennessee Valley*"), upon which *TransWestern* and *Consumers' Counsel* relied, are Natural Gas Act ("NGA") cases that are inapposite because that statute lacks the fifteen-month refund limit Congress added to FPA section 206. *Transwestern*, 897 F.2d at 573-75 (discussing NGA orders at issue); *Consumers' Counsel*, 826 F.2d at 1138 ("The issue here is the prospective nature of remedies which [FERC] may impose under section 5 of the NGA."); *Tennessee Valley*, 470 F.2d at 450-51 (faulting agency's "decision to *dismiss* the [NGA section] 5 proceeding rather than to *reopen* the matter for further investigation").

Although courts often interpret the NGA and FPA "interchangeably," *e.g.*, *Emera Maine*, 854 F.3d at 20, the NGA is critically different from the FPA in this context. Congress did not amend any NGA provision to grant FERC the authority to issue fifteen months of refunds. Neither NGA section 5 (FPA section 206's

statutory counterpart) nor any other NGA section includes any such provision, making *Transwestern*, *Consumers' Counsel*, and *Tennessee Valley* inapposite here.

Nor is *La. Pub. Serv. Comm'n v. FERC*, 866 F.3d 426 (D.C. Cir. 2017) controlling. Although this Court recognized in passing "FERC's ample authority to remedy its own errors after being reversed in court, notwithstanding the prohibition on retroactive ratemaking" after the petitioner did not dispute it, *id.* at 431, that case addressed only the narrow issue of the lawfulness of FERC's decision to delay implementation of a new just and reasonable rate to the beginning of the following year due to the annual nature of the rate design. Unlike this case, in *Louisiana Public Service Commission*, FERC "fixed" the new rate in its initial order and did not subsequently revise it as FERC did here.

Simply put, there is no "legal error" exception to FERC's obligation to provide only prospective relief under section 206(a).

### b.    FERC's Boundless Theory of "Legal Error" Lacks Merit

Even if FERC is correct that there is a "legal error" exception to the statutory requirement to award only prospective relief under section 206(a), FERC must still demonstrate that it actually committed a legal error in Opinions 551, 569, and 569-A. FERC appears to argue that any remand by a federal court automatically constitutes a "legal error" sufficient to give FERC carte blanche to backdate even a policy change by several years. To be sure, this Court remanded FERC's actions in *Emera*

31

*Maine* and *MISO Transmission Owners*, but neither case rendered Opinions 551, 569, or 569-A "legal error." Instead, this Court's precedent—some of which FERC itself cites in support—makes clear that to commit a "legal error," FERC must misinterpret a statute or commit some other concrete error in its legal analysis.

In *Consumers' Counsel*, this Court determined that FERC "err[ed] in its interpretation of prospectivity" for purposes of awarding remedies under NGA section 5. *Consumers' Counsel*, 826 F.2d at 1138. In *Tennessee Valley*, the Federal Power Commission similarly erred by dismissing an NGA section 5 proceeding instead of reopening it for further investigation, which it ultimately chose to do after its decision was challenged on appeal. *Tennessee Valley*, 470 F.2d at 451. *Transwestern*, on the other hand, did not even involve legal error, rendering the language FERC cites from it dicta. *Transwestern*, 897 F.2d at 578 n.5 ("No one suggests that these exceptions relating to correction of [FERC] error are applicable here."). The legal error in *Xcel* was FERC's failure to suspend a section 205 proceeding and thus its failure to "adher[e] to section 205's mandate." *Xcel*, 815 F.3d at 953-54. And in *TNA*, FERC made an error of law by determining that FPA sections 201(f) and 205 limited its "authority to order a *recoupment* where a non-jurisdictional entity improperly received a refund." *TNA*, 857 F.3d at 359. The caselaw is clear: to commit "legal error" FERC's mishap must go beyond simple failures to explain its decisions.

Indeed, should this Court uphold FERC's expansive view of "legal error," FERC would have essentially unlimited refund authority after issuing an initial order. FERC could simply issue an order, claim that such order "fixed" the new rate, and then take limitless time to consider new evidence, continue hearing procedures, evaluate new policy preferences, and ultimately issue a subsequent order that bears no resemblance to the first, at the end of which process FERC would be able to claim its initial order was "legal error" and order years' worth of refunds. Such a course of action would be contrary to Congress's intent in vesting in FERC carefully prescribed and limited refund authority in the 1988 Act. If FERC already had the authority to grant years' worth of retroactive refunds in the manner it suggests, Congress need not have added section 206(b) at all.

### c.    FERC's "Endless Fiddling" with the ROE Was Not Necessary to Correct a Legal Error

Even if FERC did commit *some* legal error in its prior orders, the steps FERC took in response to *Emera Maine* and *MISO Transmission Owners* were policy decisions that went far beyond what was necessary to correct any such legal error.

*Emera Maine*, which concerned an unrelated proceeding and parties, faulted FERC's *application* of the two steps of a section 206 rate change analysis and FERC's failure to make "an explicit finding that the existing ROE was *unlawful* before it was authorized to set a new *lawful* ROE." *Emera Maine*, 854 F.3d at 26. However, the Court did not dictate how FERC should evaluate existing ROEs or

how it should determine new ROEs when warranted, nor did it declare FERC's general ROE methodology itself unlawful. *See id.* Instead, the Court simply found that FERC failed to: (i) "demonstrate the unlawfulness" of the existing rate; and (ii) "set forth a rationale connection between the record evidence and its placement of the base ROE." *Id.* at 22, 27. *Emera Maine* did not require a wholesale abandonment of the methodology FERC adopted in the Opinion 531-series or Opinion 551. Instead, FERC chose to throw out the baby with the bathwater by reopening the record and developing a whole new ROE method. FERC, of course, was free to do so. But that was FERC's choice, not *Emera Maine*'s mandate.

FERC made no finding that the record underlying Opinion 551 suffered from the same deficiency as the record in *Emera Maine*. *See id.* at 28 ("FERC failed to explain how any evidence demonstrated that 10.57 percent was a just and reasonable base ROE."). FERC thus failed to explain why it could not satisfy *Emera Maine* on the Opinion 551 record. Indeed, the Court's decision in *Emera Maine* was not a repudiation of FERC's methodology, only of FERC's failure to adequately justify it. *Id.* at 30 ("It is not our job to tell FERC what the 'correct' ROE is for [the New England Transmission Owners], but it is our duty to ensure that FERC's decision is 'the product of reasoned decisionmaking.'" (quoting *Pub. Serv. Comm'n of N.Y. v. FERC*, 813 F.2d 448, 465 (D.C. Cir. 1987)).

The extent of FERC's changes in Opinion 569 illustrates how much further FERC went than would have been required to survive *Emera Maine* review. For example, in Opinion 569, FERC explained it would begin relying on two financial models instead of one to conduct the ROE analysis, adding the capital asset pricing model to its traditional discounted cash flow model. *See* Opinion 569 at P 31 (JA____). FERC justified that methodological change based on its "expanded experience with ROE determinations under various market conditions and the court's guidance in *Emera Maine*." *Id.* at P 32 (JA____). But *Emera Maine* found no fault with FERC's reliance on discounted cash flow analysis and thus identified no legal error with FERC's modeling choice. The Court did not provide FERC any "guidance" on model choice. Opinions 569 and 569-A instead confirm that FERC's decision to adopt a different approach than it had employed before had nothing to do with *Emera Maine.*

FERC reiterated in Opinion 569-A that it "continue[d] to find that ROE determinations should consider multiple models, both to capture the variety of models used by investors and to mitigate model risk." Opinion 569-A at P 43 (JA____). In the same order, FERC justified adding the risk premium model to the mix. *Id.* at P 112 (JA____) (footnote omitted).

While FERC is, of course, "entitled to adopt any methodology it believes will help it ensure that rates are just and reasonable, so long as it doesn't adopt that

methodology in an arbitrary and capricious manner," *MISO Transmission Owners*, 45 F.4th at 261, this does not mean the wide array of changes FERC made in its various orders were required by *Emera Maine*. Instead, they were policy choices resulting from FERC's own reconsideration, based upon further development of the record *after* Opinion 551, which were *not* required to satisfy *Emera Maine*. FERC may change policy, but it cannot pretend that its 2024 order "fixed" a rate in 2016, any more than did the 2019 and 2020 orders the Court previously reviewed. Nor does FERC changing its mind constitute "legal error" triggering section 309 authority. Accordingly, the "legal error" arguments set forth in the vacated Opinion 569-A remain incorrect and inapposite, and FERC cannot rely on them over four years later in the Rehearing Order to support its choice to impose additional refunds.

Moreover, *MISO Transmission Owners* did not render Opinions 551, 569, or 569-A "legal error" for section 309 purposes or necessitate the policy choices made in the Remand Order. *MISO Transmission Owners* faulted FERC for *failing to adequately explain* "its decision to include the Risk Premium model after initially rejecting it in [Opinion 569]." Remand Order at P 20 (JA____). The Court explained that FERC could adopt the risk premium model on remand, "[b]ut to do so, it must provide a 'reasoned explanation' for its decision to disregard 'facts and circumstances that' justified its prior choice." *MISO Transmission Owners,* 45 F.4th at 264 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-16 (2009)).

36

In other words, the Court vacated Opinion 569-A because FERC failed to adequately explain a change it made to a policy choice it adopted in Opinion 569.

Finally, fatal to FERC's legal error argument is its acknowledgment in the Remand Order that it was not foreclosing the use of the risk premium model in a future proceeding. Remand Order at P 24 (JA____) ("Therefore, while we do not adopt the Risk Premium model here for the reasons discussed above, we do not foreclose the use of a Risk Premium model in future proceedings if parties can demonstrate the concerns discussed above have been addressed."). This makes clear that FERC's orders after Opinion 551 involved policy choices and not corrections of legal errors.

## III.   FERC ERRED IN PERMITTING A SECOND COMPLAINT TO CIRCUMVENT THE FPA'S EXPRESS FIFTEEN-MONTH LIMIT ON REFUNDS

FERC erred in permitting serial complaints challenging the very same rates filed solely to circumvent the FPA's explicit fifteen-month limitation on refunds. *See id.* at PP 34-41 (JA____-JA ____). FERC admits that the Second Complaint challenges the same rate as the First Complaint. Rehearing Order at P 89 (JA____). Nonetheless, FERC found the Second Complaint was not barred by the FPA's refund limits because the complaint was based on "new data" that made it "an entirely new proceeding, based on an entirely separate factual record" consistent with its own prior orders interpreting the 1988 Act. *Id.* (JA____) (quoting *Ark. Elec. Coop. v.*

*ALLETE, Inc.*, 156 FERC ¶ 61,061, at P 33 (2016) (citing *S. Co. Servs.*, 83 FERC ¶ 61,079, at 61,387 (1998))).  FERC's findings fail on review of both the record facts and the law.

As an initial matter, FERC's characterization of the data submitted to support the Second Complaint as "new data" fails on closer review.  As the Transmission Owners pointed out, the complainants in the Second Complaint, all of whom were parties to the First Complaint, filed the *identical* witness analysis in both the First Complaint and Second Complaint proceedings; they merely changed the docket numbers.  *See, e.g.*, Request for Rehearing of Xcel Energy Services Inc. on Behalf of Respondents Northern States Power Company, a Minnesota Corporation and Northern States Power Company, a Wisconsin Corporation, Docket No. EL15-45-001, at 7 (July 20, 2015) (JA____).  Indeed, FERC acknowledged that the Second Complaint relied on analysis from the First Complaint proceeding, Rehearing Order at P 89 (JA____), but yet still retreated to its justification that it was acting on a "new analysis" in setting the Second Complaint for hearing, *id.* (JA____).  The Second Complaint's submission was also timed exactly to coincide with the end of the fifteen-month statutory refund period for the First Complaint, further demonstrating that its purpose was to stretch the refund period beyond the statutory fifteen months, which FERC ignored.  FERC's internal inconsistencies, failure to offer a cogent explanation for its strained interpretation, and failure to grapple with unrefuted facts

38

render its decision arbitrary and capricious. *E.g.*, *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (per curiam) (finding an internally inconsistent order arbitrary and capricious). Given the timing, identical evidence, and common rate at issue in both proceedings, the sole purpose of the Second Complaint was, and remains, unmistakable—to circumvent the fifteen-month limitation on refunds Congress prescribed in FPA section 206(b). FERC's claims of "new data" to support its decision to entertain the complaint instead of dismissing it outright are specious and contrary to the FPA's refund limit.

Moreover, FERC misreads the refund limit in section 206 to bar successive complaints only to the extent identical data is cited in both complaints. This reading is contrary to the statute's express language for several reasons. First, FERC's reading has no basis in the text or purpose of the statute. Nowhere does the statute state or suggest that either FERC or a complainant may extend the public utility's refund exposure simply by "institut[ing] a [new] proceeding" as long as the complaints do not rely on identical data. This reading fails to comport with the purpose of the refund limitation.[3] Thus, FERC's "new proceeding" theory contravenes the FPA's plain language and does not justify allowing the Second

---

[3]    Indeed, FERC acknowledged that "Congress indicated that the [fifteen]-month refund period was *intended to limit the refund exposure of public utilities*," Opinion 569 at P 569 (JA____) (emphasis added) (citing S. Rep. No. 100-491, at 6 (1988)).

39

Complaint to proceed. *Atl. City Elec.*, 295 F.3d at 8 (stating that "FERC is a 'creature of statute,'" possessing *only* those authorities conferred upon it by Congress.' . . . In the absence of statutory authorization for its act, an agency's 'action is plainly contrary to law and cannot stand.'" (citations omitted)).

Second, FERC's interpretation is flawed because it renders the refund limit a nullity. Given the "'endlessly reiterated principle . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage,'" *Indep. Ins. Agents of Am. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) ("*Independent Agents*") (quoting *Qi-Zhou v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)), FERC's interpretation cannot stand because it reads this express limit out of the statute. Contrary to FERC's suggestion that filing a perfunctory second complaint is sufficient to escape the statutory refund limit, "'Congress cannot be presumed to do a futile thing,'" *Independent Agents* at 644 (quoting *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997)), and the Court must "presume that, in a statute, Congress meant what it said and said what it meant." *Emera Maine*, 854 F.3d at 24. It cannot be assumed, as FERC does here, that Congress expected parties could easily side-step the fifteen-month refund period limitation. Otherwise, "Congress would have no reason" to have adopted the fifteen-month refund period in the first place. *Independent Agents* at 644.

40

Finally, FERC's interpretation is unreasonable because the FPA contains an express exception to the refund limit such that an additional exception should not be read into the statute.  Under the maxim of *expressio unius est exclusio alterius* (i.e., the mention of one thing implies the exclusion of another thing), *id.*, FERC's authority to extend the statutory fifteen-month refund period in only one context—where the public utility acted in a dilatory manner to delay the proceeding—means that Congress intended to preclude all other exceptions to the fifteen-month limitation.  Under *expressio unius*, "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies," and "'[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) (citation omitted).  Accordingly, because the statute contains only one exception to the fifteen-month limitation—and that exception does not involve the perfunctory submission of successive complaints—permitting such successive complaints simply to extend refunds violates the statute.[4]

---

[4]    While this Court has expressed skepticism of employing *expressio unius* in the context of administrative statutes, the doctrine overcomes this skepticism "where the context shows that the "draftsmen's mention of one thing, *like a grant of authority*, *does* really necessarily, or at least reasonably, *imply the preclusion of alternatives*," and "the cannons of avoiding surplusage and

## CONCLUSION

The Transmission Owners' petitions should be granted and FERC's orders should be vacated as discussed above.

Respectfully submitted,

/s/ Christopher R. Jones
Christopher R. Jones
Troutman Pepper Locke LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2181
christopher.jones@troutman.com

C. Dixon Wallace, III
Troutman Pepper Locke LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
(804) 697-2279
dixon.wallace@troutman.com

*Attorneys for Petitioners in*
*Nos. 25-1066 and 25-1124*
*Ameren Services Company as agent for*
*Union Electric Company, d/b/a Ameren*
*Missouri, Ameren Illinois Company d/b/a*
*Ameren Illinois, and Ameren*
*Transmission Company of Illinois*

August 14, 2025

/s/ Wendy N. Reed
Wendy N. Reed
Matthew J. Binette
Ruth M. Porter
WRIGHT & TALISMAN, P.C.
1200 G Street NW, Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
porter@wrightlaw.com

*Attorneys for Petitioners in*
*Nos. 25-1045 and 25-1115*
*the MISO Transmission Owners*

---

*expressio unius are at their zenith* when they apply in tandem." *Independent Agents*, 211 F.3d at 645 (emphasis added) (citation omitted).

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| MISO Transmission Owners, et al., | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Nos. 25-1045, et al. (consolidated) |
| | ) | |
| Federal Energy Regulatory | ) | |
| Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Rules 32(a)(7)(B) and 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned certifies that the foregoing brief complies with the applicable type-volume limitations. The brief was prepared using a proportionally spaced type (Times New Roman, 14 point) and contains 9,895 words, not including the cover page, corporate disclosure statement, tables of contents and authorities, the glossary, the certificates of counsel, the addendum, the signature block, and proof of service. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2016) used to prepare the brief.

Respectfully submitted,

*/s/ Matthew J. Binette*
Matthew J. Binette
WRIGHT & TALISMAN, P.C.
1200 G Street, NW, Suite 600
Washington, DC  20005-3898

*Attorney for*
*the MISO Transmission Owners*

ii

## ADDENDUM

Administrative Procedure Act, 5 U.S.C. § 706........................................................ A-1

Federal Power Act § 206, 16 U.S.C. § 824e.......................................................... A-2

Federal Power Act § 309, 16 U.S.C. § 825h.......................................................... A-5

Federal Power Act § 313, 16 U.S.C. § 825*l*.......................................................... A-6

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

### Editorial Notes

#### AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted ''sixty'' for ''thirty'' in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

### Statutory Notes and Related Subsidiaries

#### STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

### § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission

may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

### Editorial Notes

#### REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commis-

_____
[1] See References in Text note below.

sion shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, § 4, Oct. 6, 1988, 102 Stat. 2300, provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however,* That such complaints may be withdrawn and refiled without prejudice.''

##### LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, § 3, Oct. 6, 1988, 102 Stat. 2300, provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

##### STUDY

Pub. L. 100–473, § 5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, § 207, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, § 208, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

### § 824h. References to State boards by Commission

#### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

#### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

(b) All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

(June 10, 1920, ch. 285, pt. III, § 308, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 858.)

### § 825h. Administrative powers of Commission; rules, regulations, and orders

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

(June 10, 1920, ch. 285, pt. III, § 309, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 858.)

#### Statutory Notes and Related Subsidiaries

##### COMMISSION REVIEW

Pub. L. 99–495, § 4(c), Oct. 16, 1986, 100 Stat. 1248, provided that: "In order to ensure that the provisions of Part I of the Federal Power Act [16 U.S.C. 791a et seq.], as amended by this Act, are fully, fairly, and efficiently implemented, that other governmental agencies identified in such Part I are able to carry out their responsibilities, and that the increased workload of the Federal Energy Regulatory Commission and other agencies is facilitated, the Commission shall, consistent with the provisions of section 309 of the Federal Power Act [16 U.S.C. 825h], review all provisions of that Act [16 U.S.C. 791a et seq.] requiring an action within a 30-day period and, as the Commission deems appropriate, amend its regulations to interpret such period as meaning 'working days', rather than 'calendar days' unless calendar days is specified in such Act for such action."

### § 825i. Appointment of officers and employees; compensation

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 10, 1920, ch. 285, pt. III, § 310, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859; amended Oct. 28, 1949, ch. 782, title XI, § 1106(a), 63 Stat. 972.)

#### Editorial Notes

##### CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" have been omitted as obsolete and superseded.

Such appointments are subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order No. 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, § 1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5, Government Organization and Employees.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed Pub. L. 89–554, Sept. 6, 1966, § 8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

##### AMENDMENTS

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

#### Statutory Notes and Related Subsidiaries

##### REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, § 8, 80 Stat. 632, 655.

### § 825j. Investigations relating to electric energy; reports to Congress

In order to secure information necessary or appropriate as a basis for recommending legislation, the Commission is authorized and directed to conduct investigations regarding the generation, transmission, distribution, and sale of electric energy, however produced, throughout the United States and its possessions, whether or

**(c) Availability of information and reports to State commissions; Commission experts**

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, § 209, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824i. Interconnection authority

**(a) Powers of Commission; application by State regulatory authority**

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

   (A) the physical connection of any cogeneration facility, any small power production facility, or the transmission facilities of any electric utility, with the facilities of such applicant,

   (B) such action as may be necessary to make effective any physical connection described in subparagraph (A), which physical connection is ineffective for any reason, such as inadequate size, poor maintenance, or physical unreliability,

   (C) such sale or exchange of electric energy or other coordination, as may be necessary to carry out the purposes of any order under subparagraph (A) or (B), or

   (D) such increase in transmission capacity as may be necessary to carry out the purposes of any order under subparagraph (A) or (B).

(2) Any State regulatory authority may apply to the Commission for an order for any action referred to in subparagraph (A), (B), (C), or (D) of paragraph (1). No such order may be issued by the Commission with respect to a Federal power marketing agency upon application of a State regulatory authority.

**(b) Notice, hearing and determination by Commission**

Upon receipt of an application under subsection (a), the Commission shall—

   (1) issue notice to each affected State regulatory authority, each affected electric utility, each affected Federal power marketing agency, each affected owner or operator of a cogeneration facility or of a small power production facility, and to the public.[1]

   (2) afford an opportunity for an evidentiary hearing, and

---

[1] So in original. The period probably should be a comma.

   (3) make a determination with respect to the matters referred to in subsection (c).

**(c) Necessary findings**

No order may be issued by the Commission under subsection (a) unless the Commission determines that such order—

   (1) is in the public interest,

   (2) would—

     (A) encourage overall conservation of energy or capital,

     (B) optimize the efficiency of use of facilities and resources, or

     (C) improve the reliability of any electric utility system or Federal power marketing agency to which the order applies, and

   (3) meets the requirements of section 824k of this title.

**(d) Motion of Commission**

The Commission may, on its own motion, after compliance with the requirements of paragraphs (1) and (2) of subsection (b), issue an order requiring any action described in subsection (a)(1) if the Commission determines that such order meets the requirements of subsection (c). No such order may be issued upon the Commission's own motion with respect to a Federal power marketing agency.

**(e) Definitions**

(1) As used in this section, the term "facilities" means only facilities used for the generation or transmission of electric energy.

(2) With respect to an order issued pursuant to an application of a qualifying cogenerator or qualifying small power producer under subsection (a)(1), the term "facilities of such applicant" means the qualifying cogeneration facilities or qualifying small power production facilities of the applicant, as specified in the application. With respect to an order issued pursuant to an application under subsection (a)(2), the term "facilities of such applicant" means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the application. With respect to an order issued by the Commission on its own motion under subsection (d), such term means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the proposed order.

(June 10, 1920, ch. 285, pt. II, § 210, as added Pub. L. 95–617, title II, § 202, Nov. 9, 1978, 92 Stat. 3135; amended Pub. L. 96–294, title VI, § 643(a)(2), June 30, 1980, 94 Stat. 770.)

### Editorial Notes

AMENDMENTS

1980—Subsec. (a)(1). Pub. L. 96–294 added applicability to geothermal power producers.

### Statutory Notes and Related Subsidiaries

STUDY AND REPORT TO CONGRESSIONAL COMMITTEES ON APPLICATION OF PROVISIONS RELATING TO COGENERATION, SMALL POWER PRODUCTION, AND INTERCONNECTION AUTHORITY TO HYDROELECTRIC POWER FACILITIES

For provisions requiring the Federal Energy Regulatory Commission to conduct a study and report to

not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, §311, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859.)

### § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

#### Editorial Notes

CODIFICATION

''Sections 1535 and 1536 of title 31'' substituted in text for ''sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

#### Statutory Notes and Related Subsidiaries

CHANGE OF NAME

''Director of the Government Publishing Office'' substituted for ''Public Printer'' in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

''Government Publishing Office'' substituted for ''Government Printing Office'' in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

### § 825*l*. Review of orders

#### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

#### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be

modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

### (b) Writs of mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

### (c) Employment of attorneys

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

### (d) Prohibitions on violators

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| MISO Transmission Owners, et al., | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Nos. 25-1045, et al. (consolidated) |
| | ) | |
| Federal Energy Regulatory | ) | |
| Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this August 14, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. There are no other parties to be served.

/s/ Matthew J. Binette
Matthew J. Binette
WRIGHT & TALISMAN, P.C.
1200 G Street, NW, Suite 600
Washington, DC  20005-3898

*Attorney for the*
*MISO Transmission Owners*